**James Chester ADAMS, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

Feb. 17, 1978.

Certiorari Denied by Supreme Court
April 10, 1978.

Marvin E. Snow, John H. Poteet, Cookeville, for appellant.

Brooks McLemore, Jr., Atty. Gen., Henry E. Hildebrand, III, Asst. Atty. Gen., Nashville, Baxter Key, Jr., Dist. Atty. Gen., Carthage, Laken Mitchell, Asst. Dist. Atty. Gen., Cookeville, Bobby H. Capers, Asst. Dist. Atty. Gen., Mt. Juliet, for appellee.

## OPINION

HAL HARDIN, Special Judge.

James Chester Adams appeals from his first degree murder conviction arising from the death of his four year old stepson, Patrick Lewis Adams. The appellant's sentence of death by electrocution has been commuted to life imprisonment by executive order of the Governor of Tennessee.

The appellant makes four assignments of error, challenging (1) the denial of his motion for a change of venue based on prejudicial and inflammatory pre-trial publicity; (2) the admission of the testimony of his wife in violation of the privilege regarding confidential marital communications; (3) the admission into evidence of photographs of the partially decomposed body of the victim; and (4) the constitutionality of the death penalty. The last assignment has been rendered moot by the commutation order and must therefore be overruled. For the reasons set out below, we also overrule the remaining assignments and affirm the conviction.

On August 17, 1975, the Putnam County Sheriff's Department received word that the young victim was missing from his home, whereafter a massive search ensued, resulting in the discovery of the victim's body three days later at the bottom of a steep grade off the shoulder of a highway in Pickett County, Tennessee. The search, the discovery of the partially decomposed body of the four year old boy, and the subsequent arrest of the appellant were highly publicized in Putnam County.

The Putnam County Sheriff testified at trial that he spoke with the appellant soon after the disappearance of his stepson and that the appellant consented to a search of his truck. During this search a stained pillow case was discovered. A State forensic seriologist testified that the stains on the pillowcase were from human blood, although he was unable to type the blood. The Sheriff further testified that he searched the appellant's home and removed certain moldings, wood chips, a mattress cover and other items. The forensic seriologist testified that most of the stains on these exhibits were human blood.

The pathologist who performed the autopsy on the child testified that the victim died as the result of a severe beating and had suffered injuries to his head, a fractured skull, a broken nose, a fracture of the jaw bone, subdural and subarachnoid hemorrhaging on the body, and jagged fractures in the bone orbits of the eyes which apparently perforated both the eyeballs. The child also suffered a severe injury in

the area of his groin which the pathologist testified could have been caused by a kick. In the doctor's opinion the appellant's wife could not have administered this beating to her child because of her small size, but he concluded that the appellant was physically capable of inflicting the injuries. The medical expert explained, "[I]t's awfully hard to break children's bones because they are much more pliable than adults.'"

The appellant's wife testified that the appellant had severely beaten the child after the boy had vomited at the table while the appellant was having a meal. According to her testimony, her husband "got real mad, started slapping him and hitting him with his fist and knocking him down, and he [Patrick] was bleeding, and he told me to take him to the bathroom and clean him up." The mother testified further that after she took her son and cleaned him up, the appellant hit the victim, knocking him to the floor, and then threatened to kill the boy if he did not get up.

The appellant testified that he did not hit or beat the child and that it was his wife who caused the injury when at the meal previously mentioned she jerked her son from the chair, pulled him across the table, threw or dropped him on the floor, and kicked him. Both the appellant and his wife testified that they cooperated in disposing of the child's body. However, the appellant denied that he had left the body where it was finally discovered and theorized that he had been followed and the body moved.

## I.

The appellant initially complains that the trial judge erred in denying his motion for a change of venue based on the extensive prejudicial and inflammatory pre-trial publicity given this case. There is no doubt many of the potential jurors had read or heard about the facts of the case prior to trial. However, the question for our determination is whether the jurors who actually sat and rendered a verdict in this case were prejudiced by what we can only characterize as an irresponsible series of newspaper articles by the Cookeville *Dispatch* during the week immediately preceding the beginning of the trial.

During the period when the victim was reported missing, the search occurred, the body discovered, the arrest of the appellant was made, and the preliminary hearing was held, many local media sources gave detailed, and, in the case of the newspaper involved, front page coverage to the story. However, no motion for a change of venue was made in response to this early publicity. The actual trial did not occur until almost a year after the victim's death. However, the possibility that the passage of time would reduce the potential impact of the publicity given the case was lost when, during the week immediately preceding the commencement of the appellant's trial, the Cookeville *Dispatch* ran a series of articles which recounted the facts surrounding the police investigation of the crime a year earlier. The most seriously damaging of these newspaper accounts, in terms of potential prejudice to the appellant, was a reprint of articles containing the testimony given by the appellant's wife at the preliminary hearing.

We have carefully reviewed the many newspaper articles contained in the record on appeal, including those which ran immediately prior to trial, and there is no doubt that the articles are "sensational" in nature. However, we conclude that this result stems mainly from the fact that the details of the victim's death are themselves sensational because of the very heinous nature of the crime committed against the victim.

There are no complaints made on appeal as to the accuracy of the news articles. The facts set out are consistent with testimony later offered at trial. Thus, we are not concerned with the problem which might have arisen if the trial judge had excluded the testimony of the wife after her testimony at the preliminary hearing had been widely disseminated. Instead, we must determine whether the nature and extent of the pretrial publicity precluded the seating of an impartial jury. We recognize that because of the timing and the

content of the articles, they clearly presented a "threat or menace to the integrity of the trial," *Craig v. Harney*, 331 U.S. 367, 377, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947), due to their potential impact on the venire. The selection of the jury was a lengthy process largely because so many of the prospective jurors had formed fixed opinions about the facts. Undoubtedly this problem had been exacerbated by the extensive pretrial publicity given the case. A review of the voir dire examination of the jury indicates that all of the prospective jurors were questioned at length by the trial judge, the prosecution, and the defense attorneys with regard to their familiarity with the case. Repeatedly the jurors were questioned about whether they had formed an opinion as to the guilt or innocence of the accused, and every juror finally selected for the trial jury stated that he or she could give the defendant a fair and impartial trial upon the law and the evidence. The defendant accepted the jury as constituted without exhausting his peremptory challenges.

The question of change of venue is largely within the discretion of the trial judge, and we may not reverse his action unless there is a clear abuse of this discretion. *Broz v. State*, 4 Tenn.Cr.App. 457, 472 S.W.2d 907 (1971), *cert. denied*, 406 U.S. 949, 92 S.Ct. 2054, 32 L.Ed.2d 336 (1972); *Lang v. State*, 3 Tenn.Cr.App. 108, 457 S.W.2d 882 (1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Swain v. State*, 219 Tenn. 145, 407 S.W.2d 452 (1966).

It has been generally recognized as a rule in this state that failure to challenge for cause or failure to use any available preemptory challenge to remove objectionable jurors precludes reliance upon the alleged disqualifications of jurors on appeal. *Sommerville v. State*, 521 S.W.2d 792 (Tenn. 1975). In light of appellant's failure to exhaust his peremptory challenges, the care with which the trial judge supervised the jury selection process, and the promise of all the jurors that they could and would give appellant a fair and impartial trial, it

cannot be said that the trial judge abused his discretion in denying a change of venue.

The facts in this case are strikingly similar to those in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). There the United States Supreme Court reviewed the first degree murder conviction of a father who had abused one of his four children, tortured another, and murdered the two remaining children. As in the case before us, "[t]here was, understandably, extensive pre-trial publicity concerning several aspects of this case  .   .   . , [e.g.] substantial media coverage, including a number of television and radio stories .   .." 432 U.S. at 301, 97 S.Ct. at 2302, 53 L.Ed.2d at 361. In dealing with the question of whether the trial court erred in denying a change of venue, the Supreme Court referred to its previous holding in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), in which the Court recognized that:

> Qualified jurors need not, however be totally ignorant of the facts and issues involved.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. 421 U.S. at 799–800, 95 S.Ct. at 2036 (citations omitted).

The *Dobbert* court noted that the defendant had failed to exhaust his peremptory challenges and that he had failed to show that he did not receive a fair and impartial trial. The court concluded:

> [Dobbert's] argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selec-

tion or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the community of neither the crimes nor the putative criminal is sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere utterly corrupted by press coverage." *Murphy v. Florida, supra.* One who is reasonably suspected of murdering his children cannot expect to remain anonymous. Petitioner has failed to convince us that under the "totality of circumstances," *Murphy, supra,* the Florida Supreme Court was wrong in finding no constitutional violation with respect to the pretrial publicity.

432 U.S. at 303, 97 S.Ct. at 2303, 53 L.Ed.2d at 362.

We condemn the Cookeville *Dispatch* for what we believe to have been an extremely untimely and sensational treatment of this case in its columns during the week immediately preceding the appellant's trial. In this regard, the *Dispatch* publisher and others in a comparable position would do well to adopt and abide by the guidelines set out in Appendix A of the ABA *Standards Relating to Fair Trial and Free Press* (Approved Draft 1968, pp. 29–33). Nevertheless, we cannot say, based on the record as a whole, that the trial atmosphere in this case was so "utterly corrupted by press coverage" as to require a new trial. We therefore overrule the assignment of error related to the trial court's failure to order a change of venue.

## II.

Appellant next asserts that the testimony of his wife was admitted at trial in violation of the privilege regarding confidential marital communications. Whether the appellant's actions and statements surrounding the beating of the deceased child constitute privileged communications between

him and his wife presents a question of first impression in this State.

T.C.A. § 40–2404 provides that "[i]n all criminal cases, the husband or the wife shall be a competent witness to testify for or against each other." Subsequent to the enactment of § 40–2404 in 1915, the Tennessee Supreme Court, in discussing this provision, stated that it "did not abrogate the rule as to privileged or confidential communications," and noted that "[s]ound public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation." *McCormick v. State*, 135 Tenn. 218, 228, 186 S.W. 95, 97 (1916). This holding has been acknowledged in more recent decisions as an established limitation on the application of T.C.A. § 40–2404. *Hanvy v. State*, 215 Tenn. 322, 385 S.W.2d 752 (1965); *Burton v. State*, 501 S.W.2d 814 (Tenn.Cr.App.1973).

█ It has been generally recognized that the following conditions must exist before a communication, including that between husband and wife, may be considered privileged:

(1) The communications must originate in a confidence that they will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

8 Wigmore, *Evidence* §§ 2285, 2332 (McNaughton rev. 1961). Exceptions to the marital privilege, such as that made for communications made in the presence of third persons, generally arise from the failure of the communication to meet the above-stated conditions. *See Hazlett v.*

*Bryant*, 192 Tenn. 251, 241 S.W.2d 121 (Tenn.1951); *Burton v. State, supra* at 818, 819. Furthermore, it has been held that the privilege against disclosure of communication between wife and husband does not apply to the "elements of crimes committed by one spouse upon the other." *Royston v. State*, 1 Tenn.Cr.App. 748, 755, 450 S.W.2d 39, 42 (1969); *Wigmore, supra* § 2239. It is strongly implied by *Royston* that this exception to the marital privilege rule exists because the policy underlying the rule, "the preservation and protection of the home and the peace of families," is no longer a valid concern where one spouse has committed a crime against the other. *Royston v. State, supra*, 450 S.W.2d at 42.

◼ We believe that "marital communications," whether by conduct or by verbal statement, which arise from an act of violence by a spouse committed against the child[ren] of either spouse should constitute an exception to the marital privilege, because such "communications" fail to satisfy the conditions underlying the creation of the privilege. To the extent that confidentiality concerning such violence would foster a stronger relationship between spouses, it would clearly be a relationship in direct opposition to the rational norms and the goals of a family-oriented society. The benefit to be gained by society from the public exposure of the mistreatment of children far outweighs any injury that could be caused to the marital relationship by disclosure of the communications. Indeed, it is now the public policy of this state that incidences of child abuse should be made public and that a spouse will not be prevented from testifying as to the conduct of the other spouse in cases involving the abuse of children. T.C.A. § 37–1201, et seq.; *see especially* T.C.A. § 37–1210. It is safe to say that the policy underlying the child abuse statutes is equally compelling in a criminal prosecution involving the alleged beating death of a child by his parent.

◼ A growing number of jurisdictions have recognized that the need to protect children outweighs the policy of protecting the marriage relationship. As pointed out in *People v. Allman*, 41 A.D.2d 325, 342 N.Y.S.2d 896 (1973):

> At common law, the marital privilege was subject to the well-recognized exception that injuries to one spouse by the other were outside the rule. . . . The reasoning underlying the exception is that the enforcement of the privilege would grant a license to injure a spouse in private and the wrong thus committed would go unpunished. Moreover, an injury inflicted on one spouse by the other is destructive of the very marriage which the privilege was intended to preserve. It is not too great an expansion of the exception, and one that is justified by the reasoning basic to it, to hold that the privilege should not apply to deliberate injuries inflicted on a child of the marriage by one spouse in the presence of the other. Otherwise, the lips of the witnessing spouse would be sealed to the detriment of the child; and the injustice of the act may never be uncovered. We think . . . that the wrong to the child is equally a wrong to the observing spouse and that the performance of the injury is equally as destructive of the marriage.

*Accord, Wilkinson v. People*, 86 Colo. 406, 282 P. 257 (1929); *O'Loughlin v. People*, 90 Colo. 368, 10 P.2d 543 (1932); *Hall v. Commonwealth*, 309 Ky. 74, 215 S.W.2d 840 (1948); *Hafer v. Lemon*, 182 Okl. 578, 79 P.2d 216 (1938); *State v. Snyder*, 84 Wash. 485, 147 P. 38 (1915). We adopt the same position, and we thus hold that the marital privilege does not apply so as to prevent the admission of testimony by a defendant's spouse concerning acts of violence or personal injury inflicted by the defendant upon the children of either spouse or upon minor children in the custody of or under the dominion and control of either spouse. It follows that the appellant's assignment of error relating to the alleged violation of the marital privilege must be overruled.

### III.

◼ Finally, the appellant contends that it was error for the trial court to admit

into evidence certain photographs of the body of Patrick Adams. The four black and white photographs that were introduced reveal the location and condition of the victim's body. The admissibility of such photographs is a matter left largely to. the sound discretion of the trial judge. *Briggs v. State,* 501 S.W.2d 831 (Tenn.Cr.App. 1973). In this case the trial judge carefully exercised his discretion in the introduction of photographs. He specifically excluded a polaroid color photograph of the body of the victim and photographs taken during the autopsy of the child. Those photographs which were introduced were relevant to establish the severity of the wounds of the victim and to establish the hiding and disposal of the body. They were also relevant to the issues of intent and malice. Furthermore, these photographs are not of the gruesome nature likely to inflame the passions of the jury. Consequently, this assignment must also be overruled.

The judgment of the trial court is affirmed as commuted by order of the Governor.

RUSSELL and DAUGHTREY, JJ., concur.