IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
June 5, 2002 Session at Nashville

## STATE OF TENNESSEE v. GERALD POWERS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 96-08230-31     Joseph B. Dailey, Judge**

---

**No. W1999-02348-SC-DDT-DD -** Filed January 6, 2002

---

WILLIAM M. BARKER, J., dissenting.

At the outset, I recognize that the facts and evidence surrounding the heinous murder of Shannon Sanderson are certainly indicative of guilt on the part of the defendant, Gerald Powers. Indeed, even without the disputed testimony of the defendant's wife, the evidence implicating Mr. Powers is convincing, if not overwhelming. However, I am unwilling to affirm a criminal conviction based upon a flawed interpretation of the marital communication privilege as codified in Tennessee Code Annotated section 24-1-201(b) (Supp. 1998). In my opinion, the statutory marital communications privilege codified at Tennessee Code Annotated section 24-1-201(b) should have resulted in the exclusion of the defendant's wife's testimony relating to the defendant's confidential communications. Because I am of the opinion that reversible error occurred in this respect, I respectfully dissent.

### DISCUSSION

With regard to the marital privilege issue, the majority concludes that because the General Assembly did not include any definitions in the 1995 statute in effect at the time of the defendant's trial, it is reasonable to presume that it intended the then existing common law to supply the definitions for the relevant terms. Therefore, the majority reasons, the 2000 amendments to the statute can be viewed only as clarification amendments to the earlier language that also adopted the Adams/Hurley factors. I disagree that the legislature intended the then existing common law to supplement the 1995 amendments to the marital privilege statute.

The plain language of the 1995 statute does not require the defendant to satisfy any particular elements to invoke the privilege, other than to object to a spouse testifying to confidential communications. Indeed, unlike Adams or Hurley, nothing is said of the need to show (1) that the marital relationship is one "which in the opinion of the community, ought to be sedulously fostered;

1

or (2) that the injury resulting from the disclosure of the communications be "greater than the benefit thereby gained for the correct disposal of litigation." State v. Hurley, 876 S.W.2d 57, 63 (Tenn. 1993). Without some language to this effect, I do not believe that we can reasonably presume that the legislature intended for these particular Adams/Hurley elements to be embodied in the 1995 statute.

To put this issue in perspective, a review of the development of the marital communications privilege is helpful.[1] As the majority correctly notes, under early common law, the rule of spousal disqualification prevented one spouse from testifying either for or against the other during court proceedings. Related to, but distinct from, the broad spousal disqualification rule was the principle that marital communications made in confidence between spouses were privileged, and therefore protected from disclosure during court proceedings. This "confidential marital communications privilege" was consistently recognized by both the courts of this state and the federal courts. See Blau v. United States, 340 U.S. 332 (1951); Wolfle v. United States, 291 U.S. 7 (1934); Norman v. State, 155 S.W. 135 (Tenn. 1913); Insurance Co. v. Shoemaker, 31 S.W. 270 (Tenn. 1895).

However, in 1980 the United States Supreme Court addressed the continued viability of the spousal disqualification privilege in Trammel v. United States, 445 U.S. 40 (1980). The Court recognized that in excluding all adverse spousal testimony, the scope of the spousal disqualification privilege far exceeded all other recognized testimonial privileges. The Court acknowledged that both the ancient foundations for the privilege, and the more contemporary justifications for the privilege, were no longer valid and recognized that,

> [w]hen one spouse is willing to testify against the other in a criminal proceeding – whatever the motivation – their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.

Trammel, 445 U.S. at 52. The Court, therefore, modified the application of rule in federal courts "so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." Trammel, 445 U.S. at 53. Notably, however, Trammel expressly left intact the *independent confidential marital communications privilege* previously recognized in both Wolfle v. United States and Blau v. United States. Id. 445 U.S. at 45, n. 5.[2]

---

[1] For an excellent discussion on the development of the spousal disqualification rule and the marital communications privilege, see Pamela A. Haun, Note, The Marital Privilege in the Twenty-First Century, 32 U. Mem. L. Rev. 137 (2001).

[2] The Court, in discussing critical commentary that suggested that the confidential marital communications privilege should be substituted in place of the spousal disqualification rule, expressly stated:

This Court recognized just such a confidential marital communications privilege in Wolfle v.

2

In Tennessee, this Court abandoned the general spousal disqualification rule in civil cases long before the federal courts saw fit to do so. In Patton v. Wilson, 70 Tenn. (2 Lea) 101 (1878), we held that a wife was competent to testify in support of her deceased husband's estate as to matters which came to her knowledge from sources outside the marital relationship. Id. at 112-13.[3] A year after Patton was decided, the General Assembly codified this holding, stating that "[i]n all civil actions in the courts of this State, no person shall be incompetent to testify because he or she is a party to, or interested in, the issue tried." 1879 Tenn. Pub. Acts, ch. 200, § 1 (currently codified at Tennessee Code Annotated Section 24-1-201). However, this Court further clarified that "neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation." Id.

For a time, we interpreted the absence of a reference in the statute to the spousal disqualification rule in criminal cases to mean that the common law rule remained in effect for those cases. See Norman v. State, 155 S.W. 135 (Tenn. 1913). In 1915, however, the General Assembly clarified the abolition of the spousal disqualification in criminal cases as well. This was accomplished by passing an act that stated "hereafter in all criminal cases in the State the husband or wife shall be a competent witness to testify for or against each other." 1915 Tenn. Pub. Acts, ch. 161 (later codified at Tennessee Code Annotated section 40-17-104 and recognized by the adoption of Tennessee Rule of Evidence 501). This Act did not, however, address the continued viability of the marital communications privilege.

Shortly thereafter, in McCormick v. State, 186 S.W. 95 (Tenn. 1916), a criminal defendant challenged the constitutionality of the statute in an attempt to keep his spouse from being called as witness against him. Although upholding the statute and the trial court's ruling that the wife's testimony would be allowed, this Court expressly recognized that although the spousal disqualification rule was no longer valid by virtue of the legislature's rejection of its applicability in criminal cases, the confidential marital communications privilege survived. Thus, the privilege could still operate to prohibit one spouse from divulging confidential communications made during the course of the marital relationship. Id. at 97.[4] This Court ultimately held that certain oral and written communications made by the defendant to his wife were wrongfully permitted into evidence.

---

United States, 291 U.S. 7 (1934), and in Blau v. United States, 340 U.S. 332 (1951). In neither case, however, did the Court adopt the Wigmore view that the communications privilege be substituted *in place of* the privilege against adverse spousal testimony. The privilege as to confidential marital communications is not at issue in the instant case; accordingly, our holding today does not disturb Wolfle and Blau.

Id. (emphasis in original).

[3] The Court precluded her from testifying, however, as to matters which came to her knowledge as a result of the marital relationship, expressly preserving the confidential marital communications privilege. See Patton, 70 Tenn. (2 Lea) at 113.

[4] In fact, the rule announced in McCormick protected not only communications made between spouses, but also testimony relating to any fact "coming to his or her knowledge by reason of the marital relation." Id.

3

As we explained:

> We are therefore of the opinion that, while chapter 161 of the Acts of 1915 made a husband or wife a competent witness to testify for or against each other in all criminal cases, it did not abrogate the rule as to privileged or confidential communications. Sound public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation. The sacredness of the home and the peace of families can only be preserved and protected by enforcing this long-established rule of the common law.

Id.

McCormick remained the defining case on the issue until the Court of Criminal Appeals decided the 1978 case of Adams v. State, 563 S.W.2d 804 (Tenn. Crim. App. 1978). In Adams, the court addressed a fact scenario in which the defendant was accused of beating his four-year-old stepson to death. The trial court admitted certain testimony of the defendant's wife (the victim's mother) regarding the events surrounding the child's death, including certain verbal statements made by the defendant during the course of those events. In reviewing the trial court decision, the intermediate court applied four factors that should be satisfied before a particular communication may be protected by the privilege. (The factors are correctly set forth in the majority opinion). Applying these factors, the Adams court held that the wife's testimony was admissible.

Although the intermediate court thereafter often used the Adams factors when deciding privilege issues, this Court did not address their propriety until our decision in State v. Hurley, 876 S.W.2d 57 (Tenn. 1993). The defendant in Hurley was convicted of first degree murder, based in part, on certain letters written from the defendant to his wife. On appeal, the defendant argued the letters should have been excluded on the basis of the confidential marital communications privilege. He attempted to argue that under Rule of Evidence 501 and Tennessee Code Annotated section 24-1-201, the marital communications privilege applied to criminal cases. This Court, however, held that the confidential marital communications privilege in criminal cases was governed by the common law because the General Assembly had not amended Tennessee Code Annotated section 24-1-201 to apply to criminal cases. The Court then expressly endorsed and adopted the application of the four Adams factors to determine whether the privilege should apply to a particular marital communication. Hurley, 876 S.W.2d at 63.

We also modified the common-law rule to align it with the rule announced in Trammel, namely, that the witness spouse alone has the privilege to decide whether to testify. Id. at 64. The stated rationale was that such a rule would balance the public interest in preserving marital harmony without unduly burdening legitimate law enforcement needs. Since the defendant's wife was a willing witness, this Court found that the letters written from Hurley to his wife were not admitted in error. Id.

4

The practical effect of Hurley was to vest any confidential marital communications privilege solely in the testifying spouse. Commentators were critical of the Hurley decision because it confused the confidential marital communications privilege with the adverse testimonial privilege discussed by the United States Supreme Court in Trammel. See Alicia Brown, Comment, Evidence–*State v. Hurley*: Erosion of the Marital Privilege for Confidential Communications in Tennessee, 25 U. Mem. L. Rev. 835 (1995). Even Trammel, while holding that a witness spouse could choose to testify, recognized that confidential marital communications remained privileged and protected. See 445 U.S. at 45, N.5.

The General Assembly reacted swiftly to Hurley by amending Tennessee Code Annotated section 24-1-201 to apply to both criminal and civil proceedings. The new version of the statute provided:

> (a) In either a civil *or criminal* proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.

> (b) In either a civil *or criminal* proceeding, *confidential communications between married persons are privileged and inadmissible if either spouse objects.* This communications privilege shall not apply to proceedings between spouses or to proceedings concerning abuse of one (1) of the spouses or abuse of a minor in the custody of or under the dominion and control of either spouse, including but not limited to proceedings arising under title 36, chapter 1, part 1; title 37, chapter 1, parts 1, 4 and 6; title 37, chapter 2, part 4; and title 71, chapter 6, part 1. This confidential communications privilege shall not apply to any insured's obligations under a contract of insurance in civil proceedings.

1995 Tenn. Pub. Acts, ch. 53 (emphasis added). On its face, therefore, the amended statute provided that the confidential communications privilege could be asserted by either spouse. The 1995 amended statute was in effect at the time of this case. The defendant argues that upon his assertion of the privilege, the plain language of the statute should have operated to prevent his wife from testifying as to any oral and written statements he made to her in confidence concerning the offense. I agree.

The role of this Court in construing statutes is to ascertain and give effect to the legislative purpose and intent without unduly restricting or expanding the coverage of the statute beyond its intended scope. See Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000). Furthermore, the "legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application." State v. Blackstock, 19 S.W.3d 200, 210 (Tenn. 2000).

The language of the statute as amended in 1995 could not be more straightforward. It provides simply that, with the exception of civil proceedings between spouses, adoption cases,

dependency and neglect cases, child abuse cases, spousal abuse cases, or insurance fraud cases, "confidential communications between married persons are privileged and inadmissible if either spouse objects." This language is not in derogation of the common law, but expressly returns the law to what it was before Hurley.[5]

My conclusions in this regard are further strengthened by developments in the law after the defendant's case was tried. On May 17, 2000, the legislature amended Tennessee Code Annotated Section 24-1-201 (effective January 1, 2001) to add the four Adams/Hurley factors for criminal cases only, thus narrowing the privilege from its common-law form. See 2000 Tenn. Pub. Acts, ch. 831. The current version of the statute provides:

> (a) In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.
>
> (b) In a civil proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects. This communications privilege shall not apply to proceedings between spouses or to proceedings concerning abuse of one (1) of the spouses or abuse of a minor in the custody of or under the dominion and control of either spouse, including, but not limited to, proceedings arising under title 36, chapter 1, part 1; title 37, chapter 1, parts 1, 4 and 6; title 37, chapter 2, part 4; and title 71, chapter 6, part 1. This confidential communications privilege shall not apply to any insured's obligations under a contract of insurance in civil proceedings.
>
> (c)(1) In a criminal proceeding a marital confidential communication shall be privileged if:
>
> > (A) The communications originated in a confidence that they will not be disclosed;
> >
> > (B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;
> >
> > (C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and
> >
> > (D) The injury to the relation by disclosure of the communications outweighs

---

[5] The majority argues that "in an appendix to our opinion in State v. Bush, 942 S.W.2d 489, 509 (Tenn. 1997), we recognized that the common law prior to Hurley included the use of the Adams factors." I respectfully disagree. Since the issue was not specifically addressed by this Court in the Bush case, and because I am convinced that the Court of Criminal Appeals applied an incorrect interpretation of the statute, I would specifically overrule State v. Price to the extent that it holds that the General Assembly intended to include the Adams/Hurley factors in the 1995 version of the statute.

the benefit gained for the correct disposal of litigation.

(2) Upon a finding that a marital communication is privileged, it shall be inadmissible if either spouse objects. Such communication privileges shall not apply to proceedings concerning abuse of one (1) of the spouses or abuse of a minor in the custody of or under the dominion and control of either spouse, including, but not limited to proceedings arising under title 37, chapter 1, parts 1 and 4; title 37, chapter 2, part 4; and title 71, chapter 6, part 1.

Because the "legislature is not presumed to have passed or enacted useless legislation," see State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001), the legislature would not have expressly adopted the Adams/Hurley factors in new section 24-1-201(c) if it thought those factors were already embraced by old section 24-1-201(b) (1995). Moreover, I note that the General Assembly retained the language of the 1995 statute for civil cases only. From this fact a logical inference may be drawn that the legislature intended that new section 24-1-201(c) carry a meaning distinct from that in the older statute. See City of Chattanooga v. Davis, 54 S.W.3d 248, 268 (Tenn. 2001) (noting that "'a material change in the phraseology of a statute is generally regarded as a legislative construction that the law so amended did not originally embrace the amended provisions.'" (quoting State Bd. of Examiners for Architects & Engrs v. Weinstein, 638 S.W.2d 406, 409 (Tenn. Ct. App. 1982). Thus, if new section 24-1-201(c) was meant to adopt the Adams/Hurley factors, then the old section 24-1-201(b) language cannot be read to have also incorporated those factors. In my view, the 2000 amendments represent not only "material changes" to the statute, but they are so completely different from the 1995 version of the statute that I am at a loss to understand how the majority views the 2000 amendments as mere "clarifications" to the 1995 statute. Strikingly, for example, the majority's construction of the 1995 statute in light of the 2000 amendments results in this Court imposing the Adams/Hurley factors in civil cases despite the plain wording of the 2000 statute which makes them applicable in criminal proceedings only. Clearly, the legislature did not intend such a result. Thus, it is abundantly clear to me that the legislature believed in 2000 it was revising a statute that did not embrace, embody, or otherwise recognize the Adams/Hurley factors.[6]

## CONCLUSION

Having concluded that the law at the time of the defendant's trial did not permit the

---

[6] Looking to the legislative history to ascertain the reason and purpose for this change, I found references evincing an understanding by legislators that this was a revision to current law. The four added criteria for determining when a particular communication would be considered privileged in criminal cases were "new" criteria that were not present in the 1995 version of the statute. See Legislative Tapes on House Bill 1559, Senate Bill 1485, 101st General Assembly (Second Regular Session) (Tenn. 2000) (statement by Sen. David Fowler, Senate Judiciary Committee, May 9, 2000). There were some references to a Supreme Court opinion that "delineated the factors under which [the] privilege would be defined and could be waived." Id. (Senate Judiciary Committee, May 9, 2000; statement by Senator Fowler, Senate Session, May 17, 2000).

testimony of the defendant's wife concerning confidential marital communications, I am persuaded that the admission of such evidence was error. More importantly, I cannot say that this error did not have a direct effect on the results of the trial. This Court has stated on numerous occasions that "the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt." State v. Gilliland, 22 S.W.3d 266, 273-74 (Tenn. 2000); see also State v. Carter, 714 S.W.2d 241, 248 (Tenn. 1986) (citing Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). Therefore, no judgment or conviction will be reversed unless the errors complained of have directly affected the result of the trial on its merits. See Tenn. R. Crim. P. 52(a); see also State v. Neal, 810 S.W.2d 131, 139 (Tenn. 1991) (stating that "in a criminal case non-constitutional error must be shown by the defendant to have probably affected the judgment before reversal is appropriate"). Although there was other evidence linking the defendant to the crime, the *key* direct evidence that the defendant was the person who kidnaped, robbed, and then murdered the victim, were the incriminating statements made by Mrs. Powers. This evidence was devastating and warrants a reversal of the defendant's convictions and a new trial.

I am authorized to state that Justice Birch joins me in this dissent.

_____
WILLIAM M. BARKER, JUSTICE