# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 8, 2008 Session

## STATE OF TENNESSEE v. SHAKIR ADAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-05967      W. Fred Axley, Judge**

---

**No. W2006-02038-CCA-R3-CD  - Filed April 29, 2008**

---

The defendant, Shakir Adams, was convicted of premeditated first degree murder and sentenced to life with the possibility of parole.  The defendant appeals his conviction and argues: (1) that there was insufficient evidence to sustain his conviction; (2) that he was prejudiced by the trial court's refusal to allow the defendant to administer a jury questionnaire; (3) that he was prejudiced by the trial court's denial of his motion for continuance; (4) that he was prejudiced by the court's comments both pre-trial and during trial; (5) that he was prejudiced by the admission of evidence that the defendant was a member of a gang; and (6) that he was prejudiced by the erroneous exclusion of evidence.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Shakir Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Reginald Henderson and Scott Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### BACKGROUND

Rovonda Green testified that she lived in the Warren Apartments in November of 1999.  On the morning of November 7th, she was sitting on the balcony of an upstairs apartment with two other women and observed a group of men, including the defendant, talking together in the grassy area below.  However, she was unable to hear what the men were discussing.  Ms. Green stated that she was sitting on the apartment steps talking to her neighbors, Rosalyn Hardy and Lolar Stewart, when she heard gunshots.  She then saw the defendant running after the victim, shooting at him with a

handgun. She recalled that she had seen the victim a few times but did not know him. Ms. Green testified that her initial reaction upon seeing the shooting was to get up and run inside Ms. Hardy's apartment. After the shooting, Ms. Green met with police officers and identified a photograph of the defendant from a photographic array.

On cross-examination, Ms. Green testified that she had lived at the Warren Apartments for approximately three years prior to the incident. She stated that she did not know the defendant personally, and did not believe she had ever spoken to him. She testified that the defendant knew Lolar Stewart and stated that she had seen the defendant coming out of Ms. Stewart's apartment on more than one occasion. Ms. Green reiterated that the defendant had a gun, although she did not know what color or model of gun the defendant possessed. Ms. Green admitted that she did not tell police officers that she saw the defendant shooting at the victim in the statement she made after the shooting took place. However, she stated that she was shown a photographic array of suspects and identified the defendant as the individual who ran past her firing a gun.

On re-direct examination, Ms. Green testified that she saw both the defendant and the co-defendant, Tony Johnson, firing at the victim. She also testified on re-direct that the victim was unarmed. On re-cross examination, Ms. Green stated that before the shooting, the men walked off and out of her line of sight where she could not see them. Ms. Green admitted that in her statement to police, she said that she saw the co-defendant shooting at the victim, but did not mention that the defendant was also shooting at the victim as well. She conceded that her difficulty recalling exactly who shot at the victim was the reason she did not indicate that she saw anyone other than the co-defendant shooting at the victim in her statement to police.

Elbony Baldwin testified that she lived at the Warren Apartments with her son when the shooting occurred. She stated that her cousin, a young man named Peewee, also lived at the apartment with her and her son at that time. She stated that she was familiar with the defendant through Peewee and the defendant visited her apartment regularly.

Ms. Baldwin stated that prior to the murder, she witnessed several men standing in a circle outside the apartments around one individual. She identified the defendant as one of the men standing in the circle. She stated that the men were having an angry conversation, but she was unable to determine the subject of the conversation. She stated that as the group broke up, the defendant went and said something to a man who had been standing in the middle of the circle. After speaking to him, the man walked into a house two doors away and the defendant walked off. Ms. Baldwin stated that she went into her apartment and closed the door.

Ms. Baldwin testified that several minutes later, she left her apartment and went to the grocery store. She also testified that closer to the time of the shooting, she had returned from the grocery store and was in her apartment with Peewee putting away groceries. She stated that upon hearing gunshots, she went to the window and saw several people running past. She admitted that she did not know where the defendant was when the shots were fired. Ms. Baldwin stated that she did not see the defendant until the evening of the murder when he arrived at her apartment. Ms.

Baldwin spoke with the defendant who told her that "him and his folk, didn't give me no specific name, they shot this little dude. The young man." The defendant told Ms. Baldwin that he shot the victim once and then his gun jammed, so his associates shot him two more times. After killing the victim, the defendant and his "folk" jumped into a car and headed to his girlfriend's house in Whitehaven. The defendant also told Ms. Baldwin that his conscience was not going to be bad and that he would "sleep like a king."

Ms. Baldwin testified that she saw the defendant the next morning at the bus stop on her way to an appointment at the Department of Human Services (DHS).[1] Ms. Baldwin asked the defendant if he left the gun from the shooting in her apartment. The defendant told her that he did not leave the gun in her apartment. After her appointment at DHS, Ms. Baldwin received a phone call informing her that she needed to return to her apartment because she was going to be evicted within three days. Peewee told her that the police had been to her apartment and found the gun in her couch.

Ms. Baldwin testified that she did not know whether the defendant was a member of the Gangster Disciples, but she stated that Peewee was a member of that gang. She also stated that she did not know the identity of any of the other young men who were standing around the victim prior to the his death. Ms. Baldwin identified photographs taken of her living room, couch, and the gun found by police underneath the couch cushions. She testified that the gun belonged to the defendant. She also stated that the defendant's use of the word "folk" when he told her about the murder on the night of the shooting was commonly used to refer to fellow gang members.

On cross-examination, Ms. Baldwin testified that she had lived at the Warren Apartments for approximately a month before the shooting. She stated that she had never dated the defendant. She recounted that Peewee met the defendant at the Clayborne Apartments before Peewee moved in with her at the Warren Apartments. She also stated that the initial confrontation between the victim and the circle of men lasted only about five or six minutes. Ms. Baldwin recalled that Peewee told her about the shooting before the defendant arrived later that evening and told her that he shot the victim. The defendant's version of the story confirmed Peewee's story. After police searched her apartment, she went downtown to speak with detectives who had her call the defendant and tell him to turn himself in to the authorities. The defendant refused to turn himself in, stating that he would not do so until after his birthday on January 12, 2000. Ms. Baldwin provided detectives with the defendant's phone number. She also stated that she was not considered a suspect by police.

Lolar Stewart testified that she was outside her apartment visiting with Ms. Green and Ms. Hardy when she witnessed the murder. Ms. Stewart identified the defendant as one of the men involved in a confrontation she had witnessed earlier that day. She stated that the defendant, co-

---

[1] We note that Ms. Baldwin refers to her meeting on the day following the crime as being at the Department of Human Services (DHS), although it is also referred to as the Department of Children's Health Services and the Department of Health and Human Services at other points in the record. For ease of reference, we will continue to refer to it as the Department of Human Services (DHS).

defendant and several other men were speaking to the victim and asking him whether he knew anything about an individual named "Head" who had been shot. The victim went over to a neighboring apartment to call his cousin while the other men stood around. According to Ms. Stewart, after the victim called his cousin and returned outside, one of the men in the group called the victim's name and punched the victim in the face. The victim took off running, and the men followed after him, running and shooting. Ms. Stewart saw the defendant with a handgun. Ms. Stewart testified that when the men started shooting, she got up and ran into her apartment. After waiting inside for a period of time, she walked outside and around the corner where she saw the victim lying dead on the ground.

Ms. Stewart testified that she knew the defendant fairly well, and she had seen him with a gun on more than one occasion. Ms. Stewart acknowledged that the defendant used to come to her apartment regularly and that they had dated. Ms. Stewart stated that the defendant was a member of the Gangster Disciples, and her knowledge of that fact was based on the defendant's use of gang signs, handshakes, and his manner of talking. During an interview with police, Ms. Stewart identified the defendant from a photographic array. Ms. Stewart also identified photographs of the defendant's coat and handgun which were located in Ms. Green's apartment. Ms. Stewart further identified the statement she gave to police in which she said that she saw the defendant shoot the victim.

On cross-examination, Ms. Stewart testified that while she was talking to Ms. Green and Ms. Hardy, their attention was drawn to the confrontation that the men were having with the victim. She stated that she did not discuss the shooting with the other two women after it occurred. She described the gun used by the defendant as a black and silver gun. When shown a photograph of the handgun, she acknowledged that the gun in the photograph was almost all black, with little or no silver coloring in it. She also acknowledged that before the defendant joined the men in the circle, and before she joined the other two women on the steps, she and the defendant had been in her apartment. Ms. Stewart testified that she saw the defendant at the Warren Apartments almost every day. She stated that when she was initially questioned by police, she said that she did not know anything about the shooting. However, she said that she made her statement to police after they threatened to remove her children from her home.

Tennial Ward testified that she was visiting her sister in her apartment when the victim stopped by to use the telephone. She stated that she had seen the victim a couple of times around the apartment complex prior to the shooting. After the victim finished his telephone call, he went back outside and was confronted by at least six men. Ms. Ward stated that she opened the back door of the apartment and saw the victim talking to the men who stood in a loose circle around him. The men left soon thereafter and Ms. Ward went back inside and closed her door. Five to ten minutes later, Ms. Ward heard several gunshots. She stated that she got her children down on the floor and called the police. Ms. Ward stated that she did not know if any of the men who confronted the victim were members of a gang.

4

Officer Kevin Shaver testified that he worked as a police officer with the Crime Scene Investigation Bureau of the Memphis Police Department. He stated that he helped process the crime scene. He testified that he recovered five spent nine-millimeter shell casings, and one live nine-millimeter bullet at the crime scene. Officer Shaver testified that the nine-millimeter shell casings were manufactured by R-P Ammunition.

Officer Ricky Davidson testified that he worked as a police officer with the Crime Scene Investigation Bureau of the Memphis Police Department. He stated that the day after the shooting, he went to Ms. Green's apartment to photograph and collect the gun found in her couch. At the scene, Officer Davidson photographed and tagged a nine-millimeter handgun. Officer Davidson was able to further identify the handgun model as a Jennings Nine manufactured by Bryco Arms. Officer Davidson stated that the gun contained a magazine loaded with five live rounds manufactured by R-P Ammunition. Officer Davidson also stated that he was unable to obtain any usable fingerprints from the handgun.

Dr. O.C. Smith, a forensic pathologist, testified that he performed an autopsy on the victim and concluded that he died as a result of multiple gunshot wounds. Dr. Smith located three wound tracks in the victim's body. Dr. Smith testified that the most significant injury occurred as a result of a bullet that entered the victim's body through the "back of the shoulder and proceeded through to the front and right side of the body[,] going through the top of the left lung, injuring the subclavian artery and vein near the collarbone, and hitting the left common carotid artery." The bullet exited through the windpipe. Another bullet entered the victim's body through the thigh, striking a bone, fracturing it into multiple fragments, and lodging in the back of the thigh. A third bullet passed through the victim's bicep in one arm.

Special Agent and Forensic Scientist Steve Scott of the Tennessee Bureau of Investigation testified that he worked at the crime laboratory in Nashville where he was assigned to the Firearms Identification Unit. He testified that he performed several tests on the nine-millimeter handgun recovered from the crime scene. He identified the gun as a Jennings Nine manufactured by Bryco Arms, and stated that it was in operating condition with functioning safety features. He also testified that a bullet recovered from the victim possessed the same or similar characteristics as a bullet fired from the gun. However, the similarities were not sufficient for more conclusive identification. Agent Scott was able to conclusively identify the five spent shell casings recovered by Officers Shaver and Davidson at the crime scene as having been fired from the defendant's gun.

Based on the evidence, the defendant was convicted by the jury of first degree premeditated murder and was sentenced as a Range I, standard offender to life with the possibility of parole. The defendant filed one original and three amended motions for new trial. The trial court held a hearing after the defendant filed his third amended motion and denied his request for a new trial. Thereafter, the defendant timely filed his appeal.

**ANALYSIS**

## I. Sufficiency of the Evidence

As his first issue on appeal, the defendant argues that the evidence was insufficient to sustain his conviction for premeditated first degree murder.

Upon review, we recognize the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). The jury's verdict, once approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value given to the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*.

Our supreme court has ruled that "[t]he element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Bland*, 958 S.W.2d at 660. Factors supporting a finding of premeditation include:

> [A] motive for the killing, the use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; the

defendant's procurement of a weapon; any preparations to conceal the crime before the crime is committed; destruction or secretion of evidence; and calmness immediately after the killing.

*State v. Rick Hanebutt*, No. W2005-01301-CCA-R3-CD, 2006 WL 2818240 at *8 (Tenn. Crim. App., at Jackson, Oct. 2, 2006) *perm. app. denied* (Tenn., Feb. 26, 2007); *see State v. Dellinger*, 79 S.W.3d 458, 492 (Tenn. 2002); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). In addition, establishment of a motive for the killing is another factor from which the jury may infer premeditation. *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998).

Upon review, we conclude that the defendant has failed to establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *See Evans*, 108 S.W.3d at 236 (Tenn. 2003). The defendant was seen confronting the victim prior to the murder and was subsequently seen shooting at the victim. In addition, forensic testing of the murder weapon conclusively demonstrated that the five spent bullet casings found at the scene came from the defendant's gun. The unspent rounds found in the magazine of the defendant's gun matched the caliber and manufacturer of the shell casings from the crime scene. And although not conclusive, a bullet removed from the victim's body possessed similar characteristics to the bullets recovered from the defendant's gun.

With regard to the element of premeditation, it is clear that the defendant used a deadly weapon to kill the victim. Testimony was offered demonstrating that the victim was unarmed. Testimony was also offered showing that a possible motive for the murder of the victim was retaliation for the prior murder of a gang associate. This evidence supports the jury's finding that the defendant acted with premeditation. *See Nesbit*, 978 S.W.2d at 898. The defendant's demeanor and actions after the killing also support a finding of premeditation. The defendant returned to the scene and displayed a sense of calm. He admitted to Elbony Baldwin that he murdered the victim, told her that his conscience would not be bothered, and that he would "sleep like a king." Therefore, we conclude that sufficient evidence exists to support to the defendant's conviction for premeditated first degree murder. The defendant is without relief as to this issue.

## II. Jury Questionnaire

As his next issue on appeal, the defendant argues that trial court erred by not permitting the defendant to individually voir dire the jury and by using the defendant's proposed jury questionnaire. Specifically, the defendant sought to use his questionnaire to ascertain if jurors were tainted by media reports regarding the incarceration of defense counsel, or by statements made by the trial court to the local newspaper regarding the defendant's alleged membership in the Gangster Disciples.

At the outset, we note that the defendant's argument that he was prejudiced as a result of the court's refusal to permit him to individually voir dire the jury is hampered by the defendant's failure

7

to include a transcript of the voir dire in the record. The defendant has a duty to prepare a record which conveys a fair, accurate, and complete account of the trial court proceedings for appeal. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *see also* Tenn. R. App. P. 24(b). In the absence of an adequate record, the appellate court must presume that the trial court's rulings were correct and supported by sufficient evidence. *See State v. Taylor*, 669 S.W.2d 694, 698 (Tenn. Crim. App. 1983); *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981).

We also note that the defendant has included a transcript of the hearing on his motion for new trial. At the hearing, the defendant acknowledged that the court was willing to permit the defendant to conduct an individual jury voir dire using a questionnaire, although not the questionnaire proposed by the defendant. The defendant elected not to conduct an individual voir dire using the court-approved questionnaire. The defendant is not presumptively entitled to use his own jury questionnaire and the trial court's refusal to use that questionnaire is not an abuse of discretion. *See State v. Timmy Reagan*, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *14-15 (Tenn. Crim. App., at Nashville, May 19, 2004) (concluding there was no prejudice where trial court refused to permit defendant to use his proposed questionnaire to voir dire prospective jurors).

We conclude that the trial court did not err by refusing to permit the defendant to use his own jury questionnaire. Because the defendant in this case has failed to provide a transcript of the voir dire, because the record reflects that the defendant was afforded an opportunity to conduct individual jury voir dire using an approved questionnaire and chose not to do so, and because the defendant has failed to demonstrate that he was prejudiced by the court's denial of his proposed jury questionnaire, the defendant is without relief as to this issue.

### III. Denial of Continuance

The defendant next argues that the trial court erred by denying a continuance of his case after prior defense counsel was incarcerated for conduct related to the defendant's case. Specifically, the defendant argues that the fact that defense counsel was jailed for contempt of court, as well as the trial court's comments to the local Memphis newspaper, the Commercial Appeal, "created the need for concern of possible jury taint."

The decision of whether to grant a continuance is one that resides within the sole discretion of the trial court, and will not be overturned absent a clear showing of abuse of discretion. *See State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999); *State v. Melson*, 638 S.W.2d 342, 359 (Tenn. 1982). As with the preceding issue, the record reflects that the defendant failed to include in the record a copy of either his motion for continuance, or a copy of the transcript of the hearing on the motion for continuance. The defendant has the duty to prepare a record which conveys a fair, accurate, and complete account of what occurred at trial as it pertains to those issues argued on appeal. *See* Tenn. R. App. P. 24(b). In addition, the defendant has failed to cite to any authority or to any relevant references in the record which support his position. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court." *See also State v.*

8

*Sanders*, 842 S.W.2d 257, 259 (Tenn. Crim. App. 1992) (defendant's issue was waived where he cited no authority to support his argument). Therefore, the defendant's issue is waived.

## IV. Comments by the Trial Court

The defendant next argues that he was prejudiced by comments made by the trial court judge prior to trial and during the course of the trial.

### A. The Court's Pre-Trial Comments

The defendant argues that his trial was prejudiced by comments the trial court made prior to trial which were featured in the local Memphis newspaper, the Commercial Appeal.

This court has previously concluded that knowledge in the community will only render a trial unfair or unconstitutional if the trial atmosphere is "utterly corrupted by press coverage." *Adams v. State*, 563 S.W.2d 804, 808 (Tenn. Crim. App. 1978) (citing *Dobbert v. Florida*, 432 U.S. 282, 302 (1977). The remedy most often proscribed for such prejudice is change of venue. *Id*. However, "[t]he ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989) (citing *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981)). Prejudice is not found simply upon a showing of adverse pretrial publicity. *Dobbert*, 432 U.S. at 302.

The defendant argues that the Commercial Appeal published an article in the weeks prior to trial which reported that the defendant's attorney was released from jail where he was held for contempt of court because the trial court believed the attorney was "targeted for harm by the Gangster Disciples." The defendant argues that he was prejudiced in two ways. First, the defendant contends that he was prejudiced by statements made by the trial court that he was a member of the Gangster Disciples. Second, the defendant argues that he was prejudiced by the inference that as a Gangster Disciple, he would have arranged to have his attorney harmed while he was being held in the jail for contempt of court.

We note that the defendant failed to show that any of the jurors read the article, or that having read it, were biased or prejudiced toward the defendant as a result. It also does not appear from a review of the record that the defendant exercised any challenges for cause as a result of prejudicial pretrial publicity. Because the defendant has not offered any proof, nor cited to any authority to support his contention that he was prejudiced as a result of any comments by the trial court, the defendant's issue is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court." Tenn. Ct. Crim. App. R. 10(b); *see also State v. Keller*, 813 S.W.2d 146, 150 (Tenn. Crim. App. 1991).

### B. The Court's Comments During Trial

The defendant next argues that he was prejudiced as a result of a comment made during trial by the trial court judge when he sustained an objection raised by the state.

Upon review of the record, it appears that the state objected to a question by the defendant which called for the witness to draw a legal conclusion. With regard to the question asked by the defendant, the trial court stated:

> Members of the jury, I am sustaining or *agreeing* with the [s]tate, their objection that this witness does not possess the knowledge to answer the question that is posed by the lawyer as to whether or not someone else could have done this or - that calls for a conclusion on her part that she doesn't possess. You may proceed.

The defendant argues that the trial court's use of the word "agreeing" in the quote above could be construed by jurors that the trial court was "siding with the state's proof and [therefore] caus[ing] the jury to do the same." However, it appears from the record that the defendant failed to object to the court's statement and therefore failed to preserve the objection for appeal. In addition, the defendant failed to move for a mistrial or request a curative instruction based on the trial court's use of the word "agreeing." The defendant is not entitled to relief where he failed to avail himself of those remedies available at trial to counter the harmful effects of any error. *See* Tenn. R. App. P. 36(a).

In addition, we conclude that the defendant's argument regarding the trial court's use of the word "agreeing" is waived. The defendant has failed to offer any proof or cite to any authority to support his contention that he was prejudiced as result of any comments by the trial court. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *Keller*, 813 S.W.2d at 150.

### V. Gang Affiliation

As his next issue on appeal, the defendant argues that the trial court erred by denying his motion in limine to exclude any reference to gangs during trial.

This court has previously concluded that evidence of gang affiliation is "character evidence subject to Rule 404(b)." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., at Jackson, June 27, 2001). Rule 404(b) of the Tennessee Rules of Evidence provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. While evidence of a prior crime, wrong or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident.

10

A trial court's decision on an issue falling under Rule 404(b) is subject to an abuse of discretion standard. "Where the admissibility of the proffered evidence must also comply with Rule 404(b) and the trial court has followed the procedure mandated by that rule, it appears that the same standard, abuse of discretion, would be applicable." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (citing *State v. Brewer*, 932 S.W.2d 1, 24 (Tenn. Crim. App. 1996)). "Although evidence of a prior act is not admissible to prove propensity or disposition to commit a crime, it may arguably be relevant to issues such as identity, intent, motive, or rebuttal of accident or mistake." *See Crayton,* 2001 WL 720612, at *3; *see also* Tenn. R. Evid. 404 Advisory Comm'n Cmnts.

The defendant argues that reference to the defendant's membership in a gang was not relevant because it did not make any material fact in the case any more or less probable. *See* Tenn. R. Evid. 401. We disagree. As in *Crayton*, the state in the instant case offered evidence of the defendant's membership in the Gangster Disciples as evidence of motive for the murder. *See Crayton*, 2001 WL 720612, at *3-4. Testimony was offered during the trial that the victim was confronted by the men at the Warren Apartments precisely because he possessed information regarding the murder of a gang associate known as "Head." The defendant's gang affiliation was not offered as evidence of his character, but was instead offered to show what his motive may have been for killing the victim.

The record reflects that the defendant's motion in limine was denied by the trial court prior to trial. The defendant failed to include a transcript of the hearing on that motion, or an order documenting the trial court's findings from that hearing in the record. As stated previously, the defendant has a duty to prepare a record which conveys a fair, accurate, and complete account of what occurred at trial as it pertains to those issues argued on appeal. *See* Tenn. R. App. P. 24(b). Without a transcript of the hearing on the issue, this court must presume that the evidence supports the trial court's actions and rulings. *See State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). Therefore the defendant's argument is without merit and he is not entitled to relief as to this issue.

## VI. Exclusion of Evidence

As his final issue on appeal, the defendant argues that the trial court erred by not permitting him to ask witness Lolar Stewart on re-cross examination, when and under what circumstances she gave her statement to police.

It is well-established that a witness may be cross-examined on any matter relevant to any issue in the case, including the credibility of the witness. *See* Tenn. R. Evid. 611(b). It is equally well-established that the scope of cross-examination is limited to the subject matter of the direct examination, and the scope of re-cross examination is limited to the subject matter covered on re-direct examination. *See id.* This court has previously concluded that the scope of questions asked when examining a witness is within the trial court's discretion, and its ruling on those matters will not be overruled absent an abuse of discretion. *See State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); *see also State v. Elrod*, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986). This

court has more recently concluded that the scope of questioning on re-cross examination is also subject to the trial court's discretion. *See State v. Robert Blocker*, No. E1999-01624-CCA-R3-CD, 2000 WL 726447, at *5 (Tenn. Crim. App., at Knoxville, June 5, 2000).

The record reflects that after conducting its initial direct examination, the defendant was afforded an opportunity to ask Ms. Stewart questions on cross-examination. During the state's re-direct examination, prosecutors did not ask any questions pertaining to the timing or conditions under which Ms. Stewart made her statement to police. Thereafter, the defendant, on re-cross examination, attempted to ask Ms. Stewart when she made her statement to police, and whether she made her statement because police threatened her with the removal of her children from her home if she did not cooperate. The state objected to the question and the trial court sustained the state's objection.

We conclude that the trial court did not err in sustaining the state's objection. The defendant's question was clearly outside the scope of what the state covered on re-direct examination. *See* Tenn. R. Evid. 611. Furthermore, because the scope of questioning is within the trial court's discretion and the defendant has failed to demonstrate that the trial court abused its discretion, the defendant's argument is without merit. The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasons and authority, we affirm the judgment of the trial court.

_____
J.C. MCLIN, JUDGE