IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville December 14, 2004

## STATE OF TENNESSEE v. DOREEN JONES

**Appeal from the Circuit Court for Warren County**
**No. F-8962     Larry B. Stanley, Jr., Judge**

---

### No. M2003-01942-CCA-R3-CD - Filed March 18, 2005

---

The defendant, Doreen Jones, was convicted of second degree murder.  The trial court imposed a Range I sentence of twenty-one years.  In this appeal, the defendant asserts (1) that the evidence is insufficient to support the conviction; (2) that the trial court erred in its instructions to the jury; (3) that the trial court erred by admitting into evidence certain photographs of the victim; (4) that the trial court erred by failing to instruct the jury regarding expert testimony provided by a defense witness; (5) that the trial court erred by admitting into evidence a videotape recording; (6) that the trial court erred by permitting the medical examiner to testify that the victim's death resulted from abuse and neglect and by refusing to redact this statement from the autopsy report; (7) that the trial court erred by permitting the state to read certain Social Security regulations; and (8) that the trial court erred by refusing to grant a change of venue.  The defendant has also asked this court to review the propriety of the sentence in light of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004).  The judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

Dan T. Bryant (at trial and on appeal), Robert Boyd (at trial), and Scott Grissom (at trial), Assistant District Public Defenders, for the appellant, Doreen Jones.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; and Dale Potter and Larry Bryant, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On September 25, 2001, Richard Steinbach, a paramedic with Warren and Dekalb County Emergency Medical Services, responded to a call at the defendant's residence.  When he arrived, the defendant, the sole caretaker of the victim, directed him to a small bedroom, where the victim, sixty-

seven-year-old Fletcher Anderson, was lying in a bed partially clothed and completely uncovered. According to Steinbach, there was no bedding and the victim was lying on a vinyl shower curtain. Because he was cold to the touch, blue in color, and had no obvious pulse, Steinbach initially believed that the victim was dead but, upon further examination, discovered that the victim was breathing. Steinbach placed an endotracheal tube into the victim's throat to help with his breathing and then transported the victim to the emergency room of River Park Hospital.

The victim was admitted to the hospital and treated but died seven days later. After an investigation by the McMinnville Police Department, the defendant was charged with second degree murder.

Dr. Laura Helfman, who treated the victim when he arrived at the emergency room, testified that the victim was "cachetic," or "skin and bones," and suffering from malnourishment and hypothermia. She observed widespread bruising with several bedsores and determined that the victim's prognosis for recovery was not good. While Dr. Helfman acknowledged that some elderly patients often suffer from low body temperature, it was her opinion that the victim's body temperature of only eighty-four degrees could not be explained by poor circulation. It was also her opinion that medication would not account for such a low temperature.

Bruce Carr, a registered nurse who assisted in the treatment of the victim during his hospital stay, described the victim as "emaciated" and in an "advanced stage of starvation," having "lost most of his muscle mass." Carr stated that the victim "had skin stretched over the bones . . . . His temples were sunken in. The orbits of his eyes were protruded. He looked to be terribly dehydrated as well as malnourished." It was determined that the victim, who was between 5'6" and 5'9" tall, weighed only eighty-one pounds and had a large bedsore on his tail bone. According to Carr, the victim "had the wasted appearance of some[one] who hadn't eaten for months [and] he had bruises and cuts and marks all over his body." When Carr asked the victim who had caused the marks on his body, he responded, "Doreen." His blood testing established that the victim was malnourished and dehydrated.

Carr testified that the victim was given intravenous fluids and fed, which improved the results of his blood tests. He stated that the victim had a good appetite, although he had trouble swallowing and the decision was made to insert a feeding tube. The victim died on the day that the tube was to be inserted.

Dr. Tom Deering, who performed the autopsy, described the victim's appearance as "literally . . . skin and bones," "[e]xtremely thin to a pathologic state." He found lesions and a number of bruises of various ages on the victim's face and body. According to Dr. Deering, hair loss on the back of the victim's head indicated that he had been lying against a mattress or other surface for "a while." He observed that the victim's abdomen was sunken to the point that the internal organs could be felt through the skin. Dr. Deering concluded that the victim's muscle mass had completely deteriorated, leaving nothing but skin to cover his bones and internal organs. The victim had edema in one foot as a result of "the fact that he [was] not able to keep fluid in his blood vessels because

he doesn't have enough protein to hold it in there, so it leak[ed] out." Dr. Deering found a large decubitus ulcer, or bedsore, on the victim's tail bone, suggesting that he had been in the same position for a prolonged period of time.

According to Dr. Deering, the victim had no anatomical defect or disease that would have affected his ability to consume or digest food. He did not detect the presence of any disease, such as cancer or tuberculosis, that would account for the victim's advanced state of muscle wasting. The victim did have a "very large pneumonia," or infection, in his right lung, which was likely caused by his aspirating food. Dr. Deering saw no evidence of a stroke or any other condition that would have contributed to the victim's emaciated appearance. It was his opinion that the victim died of "[m]alnutrition, dehydration, and hypothermia, due to neglect." He also believed that the pneumonia was a contributing factor in the victim's death, explaining that the victim was more prone to such an infection because of the advanced state of his malnourishment. It was also Dr. Deering's opinion that the victim was so severely malnourished when he entered the hospital that "no matter what the hospital [did], his chances of making it [were] not good."

While Dr. Deering acknowledged that the changes in the victim's appearance likely occurred slowly over a period of time, making it harder for someone who saw him on a daily basis to notice them, he insisted that the victim's emaciation was so severe that it should have been noticed by anyone who saw him. Dr. Deering also conceded that the victim had pulmonary emphysema but explained that the condition would not have contributed to the victim's level of malnutrition. It was Dr. Deering's opinion that while a feeding tube would have improved the victim's chances, it would not have guaranteed his survival and the victim likely would have died no matter what treatment he received. The doctor stated that "the reason that [the victim was] malnourished is because basically he was starved to death."

Three months before the victim's death, Lisa Gribble, an investigator for Adult Protective Services, visited the victim at the defendant's residence, which at that time was located in an apartment complex. Her agency had received an anonymous call alleging that the victim had lost weight, that he was not being properly cared for, that the defendant had used his money to purchase alcohol for herself, and that the defendant had been seen slapping him. According to Ms. Gribble, the defendant denied the allegations and suggested that her ex-boyfriend had made the complaint as retaliation. The defendant, who admitted that she was the payee on the victim's Social Security benefits, denied any financial exploitation and claimed to Ms. Gribble that the victim ate well.

Ms. Gribble directed the defendant to take the victim to the doctor that day. When the defendant began to make excuses as to why she could not take the victim to a doctor, Ms. Gribble telephoned 911 so that he could immediately be transported to the hospital by ambulance. Although he was transported to the emergency room, the victim was not admitted but was ordered to follow-up with his regular physician. According to Ms. Gribble, neither the emergency room physician nor the victim's regular physician felt that the victim was "at a level of risk or danger" to necessitate legal involvement at that time. Ms. Gribble visited the victim one additional time before he was admitted to the hospital just prior to his death. She reported that he was still very thin.

Ms. Gribble stated that when the victim was finally admitted to the hospital, the defendant had refused to accompany him to the emergency room. At that time, Ms. Gribble observed bruising on the victim's face, skin tears on the right side of his torso, extreme weight loss, and a severe bedsore on the victim's buttocks. When she asked the victim what had happened, the victim responded, "[The defendant] knocked me to the ground." The victim expressed fear of the defendant. Ms. Gribble acknowledged on cross-examination that the victim's regular physician had refused to sign an affidavit and physician's order so that she could intervene legally, explaining that "he as a physician did not want to become legally involved."

Eldon Johnson, who had met the defendant and the victim months earlier when they all resided at the Bybee Woods Apartments, testified that he was concerned for the victim because it appeared that he was not getting enough to eat. He recalled that when he related his concerns to the defendant, "[s]he just acted like she didn't care." He also remembered an incident at the apartment complex office when the defendant struck the victim in the back and in the face with her belt. He also stated that he had seen the victim take a box of cereal from a neighbor and eat it dry.

Katherine McBride, Richard Watson, Kimberly King, and Gwendolyn Galey all observed instances of mistreatment of the victim by the defendant at the Bybee Woods Apartments. Their testimony established that the defendant had often cursed the victim and had locked him in an unsanitary room.

Carol King, manager of the Bybee Woods Apartments, testified that on one occasion, the victim entered the rental office and "proceeded to stuff his pockets with candy bars." She stated that he had also shoved candy into his mouth. According to Ms. King, the defendant and her boyfriend, Jerry Braxton, came for the victim and the defendant took away the candy. She recalled that the victim was upset and did not want to leave but the defendant forced him into a car. Ms. King testified that the next time she saw the victim he was much thinner and had bruises on his face. She remembered that on a later occasion the defendant came into the rental office to use the telephone and she overheard the defendant say that she needed to "get food because they were coming to check on [the victim] and she needed to have food in the house."

Derwin Adcock, Lieutenant Detective of the McMinnville Police Department, testified that he interviewed the defendant as part of his investigation into the victim's death. The videotape recording of the interview was played for the jury. During the interview, the defendant initially told Detective Adcock that the victim ate well, explaining that he usually ate eggs and bacon for breakfast, a sandwich for lunch, and a large dinner. Later, she stated that she did not always have enough money for food but claimed that she fed the victim whatever she had, explaining that "it sometimes might be a can of corn" or a "piece of bread." She maintained that the victim ate "something" every day, even if there was not enough food for her to eat. The defendant stated that her only source of income was the victim's Social Security benefits, which were barely enough to cover the rent and utilities. She told Detective Adcock that every time the victim ate, it would go "straight through him." The defendant denied starving the victim and claimed that he had been up singing, talking, and laughing on the night before he was taken to the hospital.

-4-

April Rumage, a psychiatric nurse practitioner who treated the victim during his life, testified as a defense witness. Ms. Rumage, who began treating the victim in November of 2000, recalled that the victim had been diagnosed with schizo-affective disorder and required medication to manage his condition. According to Ms. Rumage, the victim missed an appointment in January, returned in February and in April, and then did not return in July as scheduled. She testified that the defendant accompanied the victim on each of the visits and sat in during interviews to help convey the victim's history. Ms. Rumage stated that she would be "very surprised" if the victim were able to relate the things that had happened to him in a cohesive manner. She testified that she had no reason to question the care that the defendant was providing to the victim. According to Ms. Rumage, the defendant was able to describe which medications were helpful to the victim and which were not. Ms. Rumage stated that the victim was always clean and dressed appropriately for the weather. She described the victim's appearance as "very frail and very thin in the face, especially." It was her opinion that the victim would have been incapable of telling someone that the defendant had struck him, that he was afraid of her, and that he did not want her around.

Ms. Rumage stated that she did not notice any change in the victim's physical condition between November and April. Ms. Rumage recalled that testing conducted in April established that the victim had low hemoglobin and a low red blood cell count. She prescribed a vitamin and provided directions for the defendant to take the victim to his primary care physician.

Dr. Charles Harlan, a forensic pathologist, also testified on behalf of the defendant. After reviewing the autopsy report, the photographs taken of the victim, and the records from the hospital stay, he agreed with Dr. Deering's conclusion that the victim suffered from malnutrition, dehydration, and hypothermia but opined that "the actual cause of death [was] the pneumonia . . . which is there because of the pulmonary edema fluid which accumulated in the lungs and the presence of the excessive fluid in the pleural spaces in the peritoneal cavity." It was Dr. Harlan's further belief that the victim "died of congestive heart failure which was caused as a result of the dehydration and hypothermia and the nutritional status." Dr. Harlan testified that the victim's dehydration, malnutrition, and hypothermia were caused by chronic illness which prevented him from being appropriately hydrated and from achieving appropriate nutritional status. According to the doctor, the victim would have died regardless of any treatment he received, explaining that "[e]ither you leave them relatively dehydrated or you hydrate them, and then they develop the pneumonia and they die. . . . You are darned if you do, and darned if you don't."

Dr. Harlan stated that it was possible to develop a decubitus ulcer in a period of six hours and opined that it was possible that someone with a bedsore like that suffered by the victim could be walking around, explaining that "[t]here is no real relationship between the decubitus and the ability to walk around from time to time." According to Dr. Harlan, the victim's hair loss was caused by his nutritional status and by the normal process of aging. He acknowledged, however, that the ultimate cause of the victim's death was malnutrition, dehydration, and hypothermia.

Ernest Whited, who met the defendant through a mutual friend, testified that he had been to the defendant's residence when she lived in the housing project and when she lived at Bybee Woods

Apartments. Whited, who described both residences as clean, did not speak with the victim on either occasion. During his visit at the Bybee Woods residence, Whited observed the victim have "an accident" on the floor, which the defendant cleaned.

Larry Battles, who became acquainted with the defendant when she worked at Jackson's Boarding Home, recalled that the victim had been a resident there. Battle testified that he never saw the defendant mistreat the victim but acknowledged that he did not see either the victim or the defendant after the boarding home closed.

Dr. Joseph Caten, the victim's primary physician, testified that he saw the victim approximately once a year. He stated that he primarily treated the victim for his mental health problems. Dr. Caten recalled that when he treated the victim approximately three months before his death, he "seemed to be his normal self." According to Dr. Caten, he saw no evidence that the victim was being abused. Dr. Caten testified that when he saw the victim in the hospital three months later, the victim had rashes, had lost weight, and "appeared very sick." He stated that the victim got better when he was given fluid and medication to raise his blood pressure and that within two days, the victim was breathing on his own but still bedridden. Dr. Caten recalled that the victim was unable to eat, so a neurologist was called to examine him. According to Dr. Caten, the neurologist suggested that a feeding tube be placed into the victim's stomach but there was no one to authorize such a procedure. While awaiting the feeding tube, the victim was fed through a nasal-gastric tube and given nutrients intravenously but the victim's heart rate dropped drastically and he died.

Dr. Caten concluded that the victim had pneumonia and sepsis, even though all of the blood cultures were negative for the presence of sepsis. Although he had never observed any signs of abuse, he indicated that the victim was malnourished, dehydrated, and suffering from low blood sugar. It was his belief that the hydration and blood sugar problems were resolved during the victim's hospital stay. It was his opinion that the victim had suffered a stroke at some point in time. He acknowledged, however, that the neurologist found no indication of a stroke. According to Dr. Caten, the victim weighed one hundred twenty-eight pounds in 1999 and eighty-one pounds when he was admitted into the hospital. He observed that the victim's mental illness coupled with the fact that he had no teeth likely contributed to his weight loss. Dr. Caten also noted that the weight loss could have been caused by malabsorption, even though the autopsy did not support such a finding. He speculated that the weight loss could also have been caused by a respiratory ailment or one of the drugs, such as Depakote, that the victim was taking to control his mental illness. It was his opinion that any one or all of these things "could have" caused the victim's death. Nevertheless, Dr. Caten agreed that the cause of the victim's death was malnutrition, dehydration, and hypothermia. While conceding that the victim was incapable of caring for himself because of his mental illness, he stated that he did not believe that his death was the result of abuse or neglect.

I

The defendant first asserts that the evidence is insufficient to support her conviction. On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Where the evidence is circumstantial in nature, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. Pruitt v. State, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 390 (1970). The trial court has the duty to charge the jury on the weight and significance of circumstantial evidence when it is the only basis upon which the state's case rests. Bishop v. State, 199 Tenn. 428, 287 S.W.2d 49, 52 (1956). Like all other fact questions, the determination of whether all reasonable theories or hypotheses are excluded by the evidence is primarily a jury question. State v. Tharpe, 726 S.W.2d 896 (Tenn. 1987); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958).

The jury is governed by four rules when testing the value of circumstantial evidence: (1) The evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; and (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. Marable, 313 S.W.2d at 456.

The proof adduced at trial established that the victim died as a result of malnutrition, dehydration, and hypothermia. Dr. Deering, who performed the autopsy, testified that there was no medical or anatomical cause for the victim's malnutrition. It was his opinion that the victim was starved to death over a period of weeks to months. There was proof that three months prior to his admission into the hospital, the victim weighed one hundred twenty-eight pounds. He weighed just eighty-one pounds when admitted to the hospital. Dr. Caten acknowledged that such drastic weight loss would have been obvious to the defendant, the sole caretaker of the victim, and that she should have sought medical attention for him. Carr described the victim as "the most starved patient" that he had ever seen. The victim had numerous bruises and abrasions and a large bedsore. Dr. Caten, Dr. Deering, Dr. Harlan, and Ms. Rumage all confirmed that the victim was unable to care for himself. Although she initially claimed that the victim ate three large meals every day, the defendant eventually admitted to police that she did not feed the victim much, claiming that she did not have enough money to buy food. She indicated to Ms. Gribble, however, that she received food stamps and that she and the victim had plenty of food. While each of the experts agreed that the victim died of malnutrition, dehydration, and hypothermia, experts for the defense cited contributing causes. As was its prerogative, the jury chose to accredit the testimony of the state's witnesses. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence was sufficient

for a rational trier of fact to have found beyond a reasonable doubt that the defendant committed "a knowing killing" of the victim.  See Tenn. Code Ann. § 39-13-210(a).

II

The defendant next contends that the trial court erred by failing to repeat the definitions of the terms "intentional," "knowing," "reckless," and "criminally negligent" when instructing the jury as to the lesser included offense of reckless homicide and as to the defense of ignorance or mistake of fact.  He claims that the definitions should have been repeated within the definition of each offense and defense.  The state submits that the trial court provided the correct instructions to the jury and that the failure to repeat the definitions was not error.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury.  U.S. Const. amend VI; Tenn. Const. art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (1939).  This right encompasses the defendant's right to a correct and complete charge of the law.  State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).  In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case."  State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30.

In this case, the trial court provided the appropriate definitions of the terms knowingly and intentionally in its instruction on second degree murder, instructing the jury as follows:

> The definition of knowingly is that knowingly means that a person acts with an awareness that her conduct is reasonably certain to cause the death of the alleged victim.
>
> The requirement of knowingly is established if it is shown that the defendant acted intentionally.
>
> Intentionally means that a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim.

Having once defined these terms, the trial court did not repeat these definitions in its instructions on the lesser included offenses of reckless homicide and criminally negligent homicide or in the instruction on the defense of ignorance or mistake of fact.  Instead, the trial court made the following statement as to reckless homicide:

> The requirement of recklessly is established if it is shown that the defendant acted intentionally or knowingly.  I previously read to you the definitions of intentionally and knowingly.

As to criminally negligent homicide, the trial court stated as follows:

> The requirement of criminal negligence is also established if it is shown that the defendant acted intentionally, knowingly, or recklessly.  I have previously defined those three words to you.

Finally, with regard to the defense of ignorance or mistake of fact, the trial court instructed the jury as follows:

> Knowingly and recklessly and criminally negligent have been previously defined in these instructions.

-8-

The defendant did not object to this practice, which has been approved by our supreme court. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). The record establishes that the jury instructions fairly submitted the legal issues and did not mislead the jury as to the applicable law. See State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998) ("A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law."). Moreover, the jury instructions were reduced to writing and given to the jury. See Tenn. R. Crim. P. 30 (requiring the jury instructions in every felony case to be reduced to writing and given to the jury during deliberations). Under these circumstances, it is our view that the defendant is not entitled to relief on this issue.

III

The defendant contends that the trial court erred by admitting into evidence post-mortem photographs of the victim. Specifically, she asserts that because medical testimony adequately described the extent of the victim's injuries, the probative value of the photographs is outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The state submits that the photographs were probative because the appearance of the victim was relevant to establish that the defendant knew she was starving him to death. The state asserts that because the appearance of the victim was "virtually indescribable," the probative value of the photographs substantially outweighed any danger of unfair prejudice.

The admissibility of photographs is governed by Tennessee Rule of Evidence 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). In order to be admissible, photographs must be relevant and their probative value must not substantially outweigh any danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Here, the state introduced nine photographs taken by Dr. Deering before conducting an autopsy of the victim. Each of the photographs depicts the victim's appearance at the time of his death and the extent of the injuries he had suffered. Although the autopsy photographs are unpleasant, each appears to have been taken prior to the initiation of any internal examination. Because the victim died of starvation, his physical appearance was particularly important. See State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995) (holding that photographs taken of the infant victim were "especially probative of [the defendant's] awareness of the possible results of his course of conduct and substantially outweighed any prejudicial effect"). Moreover, because the proof against the defendant was largely circumstantial, the state's burden in establishing that the defendant knew that her conduct would result in the victim's death was especially onerous. See id.; see also State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998) ("'A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt."'

-9-

(quoting State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971)).  While several witnesses testified as to the cause of the victim's death, the photographs displayed visible signs of malnutrition and dehydration.  In our view, the trial court did not abuse its discretion by admitting the photographs.

IV

The defendant next contends that the trial court erred by failing to instruct the jury that Dr. Caten was an expert witness.  The state submits that because Dr. Caten was never tendered as an expert by the defendant, the trial court did not err.  In the alternative, the state asserts that any error was harmless.

Initially, the defendant has failed to cite any authority for her argument and it is, therefore, waived.  See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).  Further, the defendant has waived our consideration of this issue by contributing to the error at trial.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

More important, the record establishes that the defendant is not entitled to relief.  Generally, the qualification of an expert witness is a matter entrusted to the sound discretion of the trial court. There can be no reversal on appeal absent clear abuse of that discretion.  State v. Williams, 657 S.W.2d 405, 411 (Tenn. 1983).  The record establishes that while Dr. Caten was questioned generally about his medical education and experience, the defendant did not ask during trial that he be qualified as an expert witness.  Further, when discussing the jury instructions with the trial court and the prosecutor, defense counsel conceded that only Dr. Deering and Dr. Harlan had actually been qualified as expert witnesses.  Under these circumstances, it is our view that the trial court did not err by failing to provide an expert witness instruction with regard to Dr. Caten's testimony. Moreover, any error could be classified as harmless because Dr. Caten was not prevented from testifying about his medical opinions and was unable to dispute Dr. Deering's findings as to the cause of the victim's death.

V

The defendant also claims that the trial court erred by permitting the jury to view the videotape recording of her interview with Detective Adcock because she was wearing an inmate uniform.  She contends that an audiotape should have been played instead.  The state submits that the trial court committed no error.

The United States Supreme Court has held that a criminal defendant cannot be forced to stand trial in prison attire because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment."  Estelle v. Williams, 425 U.S. 501, 504-05 (1976).  The Court held that "[t]he defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable risk is presented of impermissible factors

-10-

coming into play." Id. at 505.  The Court also concluded that "compelling an accused to wear jail clothing furthers no essential state policy." Id.

While the defendant was not forced to stand trial in jail attire, the videotape of her interview was played for the jury.  The defendant was attired in an inmate uniform during the interview.  The videotape lasted approximately two hours in a three-day trial.  As such, the attire did not serve as a "constant reminder" that the defendant was in custody.  See id. at 504-05.  Further, the jury was not made aware that the defendant remained in custody during the trial.  The trial court concluded that the videotape was particularly relevant because of the defendant's demeanor and instructed the jury that the defendant was wearing jail attire in the video only because she had recently been arrested for the offense for which she was on trial.

As the Supreme Court has recognized, "[j]urors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." Holbrook v. Flynn, 475 U.S. 560, 567 (1986).  In our view, trial courts should take every precaution to avoid the display of the accused, who stands presumptively innocent, in prison garb or any type of restraint which reflects their custodial status.  See generally Willocks v. State, 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976) (disapproving of the practice of shackling the accused during trial).  In this case, however, the proof of the defendant's guilt, while circumstantial, was abundant.  It is our view that any error caused by the playing of the videotape can be classified as harmless, having had no effect on the verdict.  See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

VI

The defendant asserts that the trial court erred by permitting Dr. Deering to testify that the victim died as a result of malnutrition and dehydration which were caused by neglect.  She also contends that Dr. Deering's conclusion that the victim's death was the result of abuse and neglect should have been redacted from the autopsy report.  The state submits that there was no error.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence.  McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997).  Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.  "To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation.  The expert must possess a thorough knowledge upon which he testifies that is not within the general knowledge and experience of the average person." Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 443 (Tenn. 1992) (citing Kinley v. Tennessee State Mut. Ins. Co., Inc., 620 S.W.2d 79, 81 (Tenn. 1981)).  Further, Tennessee Rule of Evidence 704 provides that "[t]estimony in the form of an opinion or inference

otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Tenn R. Evid. 704.

Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court.  State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).  The trial court's decision may be overturned on appeal only upon a showing that the trial court abused its discretion.  Id.  "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"  State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)); see also State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Here, the defendant did not object to Dr. Deering's being qualified as an expert.  The record establishes that his testimony that the victim's death was caused by deficient care rather than illness would have been of substantial assistance to the jury.  See Tenn. R. Evid. 702.  That his testimony touched on an ultimate issue for the jury is not a basis for its exclusion.  See Tenn. R. Evid. 704. Similarly, the autopsy report, which contained the same conclusion, was admissible.  The defendant was permitted to fully cross-examine Dr. Deering.  Further, Dr. Harlan testified that, in his opinion, such conclusions do not belong in an autopsy report.  These were legitimate jury issues.  In our view, the trial court did not err by permitting the testimony or by refusing to redact the autopsy report.

VII

The defendant next contends that the trial court erred by taking judicial notice of and permitting the state to read into evidence a certain regulation of the Social Security Administration. That regulation provides as follows:

> (a) Current maintenance. (1) We will consider that payments we certify to a representative payee have been used for the use and benefit of the beneficiary if they are used for the beneficiary's current maintenance. Current maintenance includes cost incurred in obtaining food, shelter, clothing, medical care, and personal comfort items.

20 C.F.R § 404.2040 (2003).

Tennessee Rule of Evidence 202 provides that the trial court "shall take judicial notice of . . . any rule or regulation of which a statute of the United States or Tennessee mandates judicial notice."  A federal statute, 44 U.S.C. § 1507, provides that "[t]he contents of the Federal Register shall be judicially noticed."  Regulations published in the Code of Federal Regulations are part of the Federal Register.  See 44 U.S.C. § 1510.  In consequence, the trial court, in this case, was required to take judicial notice of the regulation in question.  See Paul Edward O'Daniel v. PNB Corporation, 1988 Tenn. App. LEXIS 567 (Tenn. Ct. App., Western Section, Oct. 10, 1988) ("We construe 44 USC § 1507 to mandate that state courts should take judicial notice of federal regulations found in these publications.  Our research has not found any case in which a state

-12-

appellate court ruled that a trial court is free to refuse to judicially notice the contents of the Federal Register and the CFR.").  The defendant is not entitled to relief on this issue.

VIII

The defendant asserts that the trial court erred by refusing to grant a change of venue.  Her request was based upon pretrial publicity in the form of an article that appeared in the local newspaper on the day before the trial.  The state submits that the defendant has failed to establish that the jurors actually empaneled were biased or prejudiced against her.

The pertinent portion of Tennessee Rule of Criminal Procedure 21 provides that "[v]enue may be changed . . . if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had."  Tenn. R. Crim. P. 21(a).  Whether to grant or deny a motion for change of venue is a matter of judicial discretion.  Rippy v. State, 550 S.W.2d 636, 638 (Tenn. 1977).  The appellate court will not interfere with the exercise of discretion absent clear abuse.  State v. Melson, 638 S.W.2d 342, 360 (Tenn. 1982).  The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.  State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981).  The burden of proof is on the defendant.  See Adams v. State, 563 S.W.2d 804 (Tenn. Crim. App. 1978).  Prejudice will not be presumed on the mere showing that there was considerable pretrial publicity.  Dobbert v. Florida, 432 U.S. 282, 303 (1977); State v. Kyger, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989).

In this case, several jurors reported during voir dire that they had read about the case in the local newspaper.  The jurors making such a report were questioned individually as to their ability to remain impartial and consider only the evidence admitted at trial.  Those who stated that they could not be impartial or could not judge the evidence without taking into account what they had previously heard about the case were excused by the trial court.  The only evidence in the record of the pretrial publicity were the statements of the potential jurors that they had read an article published the preceding day.  The article was not made a part of the record.  The defendant has offered no proof that any of the jurors impaneled to hear the case were actually biased or prejudiced by the publicity.  As indicated, the defendant bears the burden of establishing that she was prejudiced by pretrial publicity; it will not be presumed.  See Adams, 563 S.W.2d at 807-08; Kyger, 787 S.W.2d at 19.  In our view, there is nothing in the record to suggest that the trial court abused its discretion in denying a change of venue.

IX

Finally, the defendant has asked this court to review the sentence under the reasoning of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004).  Initially, the state contends that the defendant's Blakely claim is waived because it was not raised in the trial court. Recently, however, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position:

We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum. However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474, 120 S. Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1, 153 L. Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro, ___ U.S. at ___, 124 S. Ct. at 2526-27. Perhaps this resulted from the fact that Ring overruled a case that had held the opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

In any event, even if Blakely did not establish a new rule, the United States Supreme Court in Apprendi stated that the defendant's right to have a jury find facts that increase his sentence above the prescribed statutory maximum is rooted in his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial. 30 U.S. at 476, 120 S. Ct. at 2355. In State v. Ellis, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997), this court held that although there was no common law right to waive a jury trial, Rule 23, Tenn. R. Crim. P., allowed a defendant to "waive a jury trial if the waiver is in writing and is knowingly executed." Absent a written waiver, "it must appear from the record that the defendant personally gave express consent [to waive a jury trial] in open court." Ellis, 953 S.W.2d at 221. Blakely, as an extension of Apprendi, also requires proof in the record that the defendant personally waived that right.

This reasoning is persuasive. The defendant's Blakely claim in this case has not been waived.

The United States Supreme Court's opinion in Blakely calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 124 S. Ct. at 2537.

-14-

Finally, the Court concluded that "every defendant has a <u>right</u> to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2543.

Under the rule established in <u>Blakely</u>, any prior convictions may be used to enhance a sentence. The defendant has prior convictions for theft of property over $1,000, disorderly conduct, and driving under the influence. Under the rationale of <u>Blakely</u>, the sentence of twenty-one years, the midpoint within the range, is warranted.

_____
GARY R. WADE, PRESIDING JUDGE